714 S.E.2d 522 (2011)
In The Matter of D.B.
No. COA10-1476.
Court of Appeals of North Carolina.
August 16, 2011.
*523 Attorney General Roy Cooper, by Assistant Attorney General Jay L. Osborne, for the State.
Appellate Defender Staples Hughes, by Assistant Appellate Defenders Mary Cook, Kristen L. Todd, and S. Hannah Demeritt, for juvenile-appellant.
GEER, Judge.
D.B., a juvenile, appeals from the trial court's orders adjudicating him delinquent for committing the offenses of felony breaking and entering, felony larceny pursuant to breaking and entering, and misdemeanor possession of stolen goods. We agree that the petition alleging felony larceny pursuant to breaking and entering was fatally defective because it contained no allegation that the alleged victim, the Crossings Golf Club, was a legal entity capable of owning property. The petition alleging felony larceny pursuant to breaking and entering should, therefore, have been dismissed by the trial court.
We also agree with the juvenile's contention that the trial court erred in admitting evidence obtained by an officer in a search that unlawfully exceeded the scope of a Terry frisk. Accordingly, we hold that the evidence obtained as a result of that search should have been excluded, and because its admission was not harmless beyond a reasonable doubt, we must reverse as to the misdemeanor possession of stolen property offense.

Facts
The State's evidence tended to show the following facts. On 26 December 2009, Officer James Sandoval of the Durham Police Department received a call about an activated *524 burglar alarm at the clubhouse of the Crossings Golf Club in Durham County, North Carolina. Upon arriving at the location, Officers Sandoval and K. Staten observed that a back rear window to the clubhouse was shattered and the door was open. The drawer of the cash register in the pro shop was missing and was later found outside on a grassy area, about 100 feet away from the building. Approximately $12.00 in loose change was missing from that cash register drawer.
The officers had secured the building when Officer Staten received a dispatch regarding a suspicious person running from the golf course area, about two blocks away. The dispatch described the suspicious person as a black male wearing a dark-colored hooded sweatshirt, all black clothes, and blue jeans. In response, Officer Sandoval drove toward the location noted in the dispatch. He saw a black male with a dark hooded sweatshirt and blue jeans run through a yard from Oak Grove Parkway toward Brier Haven Drive.
Officer Sandoval stopped the individual, later identified as the juvenile. The juvenile was out of breath and sweating profusely. Officer Sandoval asked the juvenile to put his hands on Officer Sandoval's car, and Officer Sandoval then frisked the juvenile to make sure he did not have any weapons. At some point, when Officer Sandoval was patting down the juvenile, he felt what he perceived to be an identification card in the front pocket of the juvenile's sweatshirt. He pulled the card out and discovered that it was actually an RBC Centura Visa Card bearing the name Sharon Atkins. Ms. Atkins' card had been stolen earlier that month. After Officer Sandoval determined that the card was stolen, he placed the juvenile under arrest, put him in the vehicle, and drove back to the clubhouse.
In the meantime, Corporal Tammy Schultz had contacted Teresa Easterday, the witness who had made the suspicious person report. Ms. Easterday met Corporal Schultz at the clubhouse and sat in the back of Corporal Schultz's vehicle so she could not be seen by the juvenile. Officer Sandoval had positioned the juvenile beside his vehicle, about 15 to 20 feet away from Corporal Schultz's vehicle. With a spotlight shining on the juvenile, Ms. Easterday was able to make a positive identification, based on the juvenile's clothing, that the juvenile was the person she had seen running away from the golf course.
The positive identification was communicated to Officer Sandoval, who then read the juvenile his Juvenile Miranda Rights. The juvenile followed along with the reading of the Juvenile Miranda Rights and checked on the form that he understood these rights. The juvenile also checked that he wished to answer questions without a lawyer, parent, or guardian present. In response to Officer Sandoval's questions, the juvenile gave his name and birth date, indicating he was 15 years old at the time. The juvenile then told Officer Sandoval that he was having a bad day, that he had left a friend's house and crossed through the golf course, and that he had the "urge to bust out the window with the chair." After that, the juvenile refused to answer any more questions. Officer Sandoval then retrieved the loose change from the juvenile's pockets, which totaled approximately $7.00.
On 28 January 2010, two juvenile petitions were filed against the juvenile, alleging delinquency in that he had committed felony breaking and entering, felony larceny pursuant to breaking and entering, and misdemeanor possession of property stolen from Ms. Atkins. Following the adjudication hearing, the trial court entered orders adjudicating the juvenile delinquent of felony breaking and entering, felony larceny pursuant to breaking and entering, and misdemeanor possession of the property stolen from Ms. Atkins. The trial court entered a disposition order finding the juvenile to be a Level 2 offender and ordering that he be placed on 12 months probation and pay $85.00 in restitutionthe cost to repair the broken window at the clubhouse. The juvenile timely appealed to this Court.

I
The juvenile first contends that the juvenile petition alleging felony larceny pursuant to breaking and entering was fatally defective and should have been dismissed for lack of subject matter jurisdiction. The petition *525 alleged that the juvenile "did unlawfully, willfully and feloniously steal, take and carry away U.S. Currency from a cash register drawer" which was "the personal property of The Crossings Golf Club." The petition does not allege that the Crossings Golf Club is a corporation or other legal entity capable of owning property.
"`To be sufficient, an indictment for larceny must allege the owner or person in lawful possession of the stolen property.'" State v. Phillips, 162 N.C.App. 719, 720, 592 S.E.2d 272, 273 (2004) (quoting State v. Downing, 313 N.C. 164, 166, 326 S.E.2d 256, 258 (1985)). "If the entity named in the indictment is not a person, it must be alleged `that the victim was a legal entity capable of owning property[.]'" Id. at 721, 592 S.E.2d at 273 (quoting State v. Woody, 132 N.C.App. 788, 790, 513 S.E.2d 801, 803 (1999)). "`An indictment that insufficiently alleges the identity of the victim is fatally defective. . . .'" Id. (quoting Woody, 132 N.C.App. at 790, 513 S.E.2d at 803). See, e.g., id. at 721, 592 S.E.2d at 274 (indictment for larceny from "Parker's Marine" insufficient); State v. Perkins, 57 N.C.App. 516, 518, 291 S.E.2d 865, 867 (1982) (indictment for larceny from "Metropolitan YMCA t/d/b/a Hayes-Taylor YMCA Branch" insufficient).
Since the petition in this case does not allege that the Crossings Golf Club is a corporation or other legal entity capable of owning property, we holdand the State concedesthat the petition was fatally defective. We must, therefore, vacate the adjudication and disposition as to the offense of felony larceny pursuant to breaking and entering. In re M.S., 199 N.C.App. 260, 267, 681 S.E.2d 441, 445-46 (2009).

II
The juvenile next argues that the trial court erred in overruling his objection to testimony regarding evidence found in his pocketMs. Atkins' RBC Centura Visa cardbecause Officer Sandoval's search exceeded the scope of a Terry frisk and was, therefore, unconstitutional. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that an officer may conduct a pat-down search to determine whether the person is carrying a weapon. "`The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.'" State v. Beveridge, 112 N.C.App. 688, 693, 436 S.E.2d 912, 915 (1993) (quoting Adams v. Williams, 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612, 617 (1972)), aff'd per curiam, 336 N.C. 601, 444 S.E.2d 223 (1994).
"If a search goes beyond the bounds justifiable in determining that the suspect is armed, then any evidence found as a result of such a search will be suppressed as fruit of the poisonous tree." Id. (internal quotation marks omitted). On the other hand, if, "`in the conduct of the limited weapons search, contraband or evidence of a crime is of necessity exposed, the officer is not required by the Fourth Amendment to disregard such contraband or evidence of crime.'" Id. at 694, 436 S.E.2d at 915 (quoting State v. Streeter, 17 N.C.App. 48, 50, 193 S.E.2d 347, 348 (1972), aff'd, 283 N.C. 203, 195 S.E.2d 502 (1973)).
Here, at trial, during a voir dire examination, Officer Sandoval testified that after he stopped the juvenile, he performed a Terry frisk of the juvenile to check for weapons. Once he determined the juvenile had no weapons, he did not consider him to be a threat. The following exchange then occurred between defense counsel and Officer Sandoval:
Q When you patted this individual down and found no weapons, you went through his pockets?
. . . .
THE WITNESS: I asked him if he had any identification.
. . . .
Q Did he indicate whether he did have I.D.?
A He didn't answer me.
Q So you went into his pockets?
A I felt what would be what I perceived to be an identification card in his front left pocket.
Q And when you felt what you thought was an I.D. card despite him not answering *526 your question as to whether he had identification, you didn't think that was a weapon did you?
A No.
When later asked by the prosecutor why he thought he felt an identification card, Officer Sandoval explained that the object in the juvenile's pocket "was smallit felt plastic, rectangular, kind of what your drivers [sic] license would feel like." Officer Sandoval further explained:
A I asked him if this was an identification card and he wouldn't answer me. And he wouldn't give me his name so I thought that was an identification card and I wanted to identify him so that's why I grabbed the card from his pocket.
Q And what was the purpose of finding out his identity?
A To see who he is, where he lives and basically to identify what he's doing in the area and why he's running.
Following Officer Sandoval's testimony, defense counsel asked the trial court to exclude the evidence of the RBC Centura Visa card found in the juvenile's pocket because Officer Sandoval's search had exceeded the scope of a Terry frisk. The court denied this request, explaining:
I'll note the objection and I'm going to overrule the motion to suppress, and I'm going to allow it based on the suspect's refusal to cooperate by giving his name, by not responding to if he had any I.D.
In pursuant [sic] or in conjunction with the Terry frisk the Officer felt what he believed to be identification and after [the juvenile] or whoever the suspect was, was uncooperative I'm going to allow what ever [sic] the Officer found as a result of patting him down.
In arguing that the evidence was properly admitted, the State focuses on the purpose of a Terry stop. The juvenile, however, has not contended that the stop or seizure was unconstitutionalhe argues solely that the subsequent pat-down exceeded the scope of a lawful Terry frisk.
It is true that "[o]fficers who lawfully stop someone for investigation may ask the person a moderate number of questions to determine his identity and to gain information confirming or dispelling the officers' suspicions that prompted the stop." State v. Steen, 352 N.C. 227, 239, 536 S.E.2d 1, 9 (2000) (emphasis added), cert. denied, 531 U.S. 1167, 121 S.Ct. 1131, 148 L.Ed.2d 997 (2001). The State, however, cites no authority for its suggestion that an officer may physically search a person for evidence of his identity in connection with a Terry stop and frisk.
Although the State relies upon Hiibel v. Sixth Judicial Dist. Court of Nev., 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), for the proposition that "the identity of a suspect can significantly impact the safety of an officer," Hiibel does not address an officer's using a pat-down to uncover evidence of identification. At issue in Hiibel was whether a Nevada statute requiring a suspect to disclose his name in the course of a valid Terry stop was consistent with Fourth Amendment prohibitions against unreasonable searches and seizures. Id. at 187-88, 124 S.Ct. at 2459, 159 L.Ed.2d at 303-04. The Court determined that because the defendant's obligation to identify himself arose from a state statute, and because the statute satisfied the Fourth Amendment constitutional standards, "[t]he principles of Terry permit[ted] a State to require a suspect to disclose his name in the course of a Terry stop." Id. at 187, 124 S.Ct. at 2459, 159 L.Ed.2d at 304 (emphasis added).
While many states have enacted "stop and identify" statutes such as the one in Hiibel, North Carolina has not. The State overlooks this crucial distinction. We further note that in Hiibel, the Supreme Court did not hold that an officer could, during the Terry frisk, search for proof of identification as well as weapons. Although the Court did note in passing that officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation and the threat to their own safety, the Court did not suggest that an officer can use a pat-down to locate an identification card. Id. at 186, 124 S.Ct. at 2458, 159 L.Ed.2d at 303.
The State cites no other authority to support the notion that an officer may search for *527 a person's identification in order to protect himself, or that an officer who feels what he believes to be an immediately identifiable identification card is free to seize it. Our case law plainly holds to the contrary.
A Terry frisk may be used only for the purpose of determining whether a suspect is armed, and contraband may be confiscated if it is immediately identifiable to the officer during the frisk. See State v. Shearin, 170 N.C.App. 222, 226, 612 S.E.2d 371, 375-76 (holding scope of Terry search is protective in nature and is limited to search for weapons that may be used against officer, but evidence of contraband, plainly felt during pat-down or frisk, may also be admissible, provided officer "had probable cause to believe that the item was in fact contraband"), appeal dismissed and disc. review denied, 360 N.C. 75, 624 S.E.2d 369 (2005); State v. Martinez, 158 N.C.App. 105, 109, 580 S.E.2d 54, 57-58 (holding officer may conduct pat-down search, for purpose of determining whether person is carrying weapon, when officer is justified in believing individual is armed and presently dangerous; during lawful pat-down search for weapons, if officer discovers contraband, officer may seize item discovered), appeal dismissed and disc. review denied, 357 N.C. 466, 586 S.E.2d 773 (2003).
Since an identification card is not a weapon or contraband, and there is no other seizure permitted under Terry, Officer Sandoval's removal of the RBC Centura Visa card from the juvenile's pocket exceeded the scope of a Terry frisk. The trial court thus erred in admitting the RBC Centura Visa card at trial.
We cannot conclude that this error was harmless beyond a reasonable doubt because the card was the only evidence presented by the State tending to show the juvenile possessed property stolen from Ms. Atkins. See N.C. Gen.Stat. § 15A-1443(b) (2009) ("A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless."). Consequently, we must reverse as to the misdemeanor possession of stolen property offense.

III
Finally, the juvenile contends that the adjudication order contains clerical errors in a finding of fact and conclusion of law. A clerical error is "`[a]n error resulting from a minor mistake or inadvertence, [especially] in writing or copying something on the record, and not from judicial reasoning or determination.'" State v. Lark, 198 N.C.App. 82, 95, 678 S.E.2d 693, 702 (2009) (quoting State v. Jarman, 140 N.C.App. 198, 202, 535 S.E.2d 875, 878 (2000)), disc. review denied, 363 N.C. 808, 692 S.E.2d 111 (2010). "`When, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record speak the truth.'" Id. (quoting State v. Smith, 188 N.C.App. 842, 845, 656 S.E.2d 695, 696 (2008)).
It is clearand the State concedesthat finding of fact three in the adjudication order contains a clerical error. Finding of fact three states: "That the Court finds that the State has presented a reasonable factual basis, that the juvenile understands their [sic] right, that the admission was freely made, that the juvenile admits that the they [sic] did in fact commit the allegations as alleged." The juvenile did not, however, admit any of the alleged offenses. Rather, as the transcript indicates, the trial court found beyond a reasonable doubt, based on the evidence, that the juvenile had committed felony breaking and entering, felony larceny pursuant to felony breaking and entering, and misdemeanor possession of stolen property.
We, therefore, remand so that the trial court may correct the adjudication order's finding of fact three to reflect that the court found beyond a reasonable doubt that the juvenile committed the offenses forming the basis for the delinquency adjudication. See State v. Snipes, 168 N.C.App. 525, 534, 608 S.E.2d 381, 387 (2005) (remanding for correction of clerical errors where trial court checked box on judgment and commitment forms indicating that it "`[i]mpose[d] the *528 prison term pursuant to a plea arrangement as to sentence under Article 58 of G.S. Chapter 15A,'" but record revealed that defendant pled not guilty to each offense); State v. Shelton, 167 N.C.App. 225, 230, 605 S.E.2d 228, 232 (2004) (remanding for correction of clerical error where box marked "`pled guilty'" was erroneously checked on judgment and charges had actually been submitted to jury).
The juvenile further claims that because finding of fact three contains a clerical error, conclusion of law twothat the juvenile committed a "serious (Class F through I felony or Class A1 Misdemeanor)"is also a clerical error. This argument is without merit. This conclusion was based on the trial court's finding beyond a reasonable doubt that the juvenile committed two Class H felonies. We have concluded that one of those Class H felonieslarceny pursuant to breaking and enteringshould have been dismissed. However, the juvenile has made no argument that would disturb the finding that he committed the breaking and entering offense. Therefore, on remand, the trial court does not need to alter conclusion of law two.
Affirmed in part; vacated in part; reversed and remanded in part.
Chief Judge MARTIN and Judge ELMORE concur.